[No. 10002. Department Two. October 14, 1912.]

INTERNATIONAL CONTRACT COMPANY, *Appellant*, v. THE CITY OF SEATTLE, *Respondent*.[1]

MUNICIPAL CORPORATIONS—PUBLIC WORKS—CONTRACT — EXTRAS— CONSTRUCTION AND OPERATION. In a contract for the construction of a concrete lining for a city reservoir, the contractor cannot recover for redressing the bottom, as an extra, where the work consisted largely of excavation, and no redressing was necessary when the contract was let, but became so by the action of the elements, and the contract provided that no claim for extras should be made for losses or damages arising from the action of the elements, and required the contractor to make such excavation as may be necessary to bring the surface to a true form and grade, to be paid for by the cubic yard as excavation, and not as redressing.

SAME—EXTRAS — SUPPLEMENTAL AGREEMENT — CONSTRUCTION AND OPERATION. Where a contract for the construction of a concrete lining for a city reservoir provided for redressing slopes only when necessary in the opinion of the city engineer, a supplemental agreement between the contractor and the city engineer by which the contractor was granted certain concessions, and redressing certain slopes was to be obviated by the filling of eroded gullies with concrete at a certain price, the supplemental agreement is a complete defense to a claim for extras in redressing the slopes, where the evidence failed to show that the city engineer had requested such redressing, but had insisted that the matter was covered by the supplemental agreement.

[1]Reported in 127 Pac. 115.

SAME—EXTRAS—ALLOWANCE. In such a case, extras cannot be allowed for excess concrete used in the sides of the slopes covered in the supplemental agreement; but should be allowed for excess concrete admittedly used in the bottom, which was not covered in the supplemental agreement.

SAME. In such a case, extras cannot be allowed for concrete placed in the bottom of the reservoir in excess of the thickness required by the contract, where the matter was in controversy and the subject of negotiations, which resulted in the acceptance of a proposition whereby the contractor was to establish a new grade, estimated by his own engineer to make the concrete of a specified average thickness, with intent thereby to avoid the redressing of the bottom and to effect a change of thickness to compensate for unevenness of the bottom, and where the city engineer's acceptance was explained by a letter of his understanding that no extra charge for concrete should be made in case the change of grade (as estimated by the contractor's engineer) increased the thickness of the concrete, which letter the contractor acknowledged to be correct.

Appeal from a judgment of the superior court for King county, Tallman, J., entered June 30, 1911, in favor of the defendant, after a hearing before the court, dismissing an action for a writ of mandate. Reversed.

*Todd, Wilson & Thorgrimson*, for appellant.

*James E. Bradford* and *Howard M. Findley*, for respondent.

ELLIS, J.—This is an action for a writ of mandate, to require the proper officers of the city of Seattle to allow and pay certain items as extras under a contract of relator with the city. The cause was tried to the court without a jury. After a full hearing upon the evidence, the court dismissed the action at the relator's costs. The relator has appealed.

On September 24, 1909, the respondent, pursuant to certain ordinances duly passed, entered into a contract with the appellant for the construction of a concrete lining for the Green Lake low service reservoir, called the "lower reservoir," and for the Green Lake intermediate service reservoir, called the "upper reservoir." The earthwork for both reservoirs had previously been performed by other

contractors under a separate contract. According to the contract here involved, the concrete lining was to consist of a bottom course or base and a top course or mortar surface. The base was to be six inches thick, and was to consist of one part cement, three parts sand, and five parts gravel, known as a 1:3:5 aggregate. The mortar surface was to be one inch thick, and consist of one part cement to one part sand, or a 1:1 aggregate. Under the contract, the total thickness of the lining would therefore be seven inches. In case of back filling made necessary by depressions or channels, the concrete filling was to be a 1:4:8 aggregate. The contract contained specific provisions for excavation, concrete filling, redressing slopes, and for extra work. These provisions were as follows:

"Excavation: The contractor shall make such excavation as may be necessary to bring the surface on which the concrete lining is to be placed to a true form and grade to receive the lining. Material necessarily excavated for this purpose shall be removed from the reservoir basin and deposited on the adjacent grounds at such locations as ordered by the engineer in charge. The price bid for excavation per cubic yard shall include excavating, loading, hauling, and dumping as above specified. Particular attention is called to the necessity of accurately finishing the surface to be concreted, and no extra yardage in concrete will be allowed for filling areas excavated below grade, unless such excavation below grade is ordered by the engineer in charge.

"Concrete Filling: When so ordered by the city engineer, channels or depressions eroded in the sides and bottoms of the reservoir basins shall be refilled with concrete which shall be mixed in the proportions of one part of cement to four parts of sand and eight parts of gravel. Concrete filling will be paid for at the rate bid therefor per cubic yard in place.

"Redressing Slopes: When it is necessary in the opinion of the city engineer to redress or repair the surface of the slopes of the reservoir it shall be done by the contractor before the concrete lining is placed thereon. Such redressing or repairing of slopes will be paid for at the rate bid therefor per square yard, such payment to be in full for performing

the work and maintaining it in condition until the concrete is placed thereon. Redressed or repaired slopes shall be in all respects as firm and true to grade as the original."

The contract also provided:

"Contractors must base their proposals on the basis of the quantities hereinafter given, but as these quantities are only approximate and not guaranteed to be correct, and intended only as a basis for the comparison of bids, payment will be made only for actual amount of work done and material furnished, whether it be more or less than the estimated amount."

The contract was let to the appellant at rates and on approximate estimates as follows: Lower reservoir concrete filling, 9,500 cubic yards, $9.08 per cubic yard; redressing slopes, 2,000 square yards, one dollar per square yard; excavation, 800 cubic yards, fifty cents per cubic yard. Upper reservoir concrete lining, 9,500 cubic yards, $9.18 per cubic yard; redressing slopes, 200 square yards, one dollar per square yard; excavation, 800 cubic yards, fifty cents per cubic yard. The appellant seeks to recover for four items of labor and material furnished in the work claimed as extras, which the respondent has refused to allow.

(1) The first item was for redressing the bottom of the upper reservoir to the extent of 23,248 square yards. The appellant claims that this was extra work for which fifteen cents a square yard was a reasonable price, at which rate this work would amount to $3,487.20. The respondent claims that this was covered by the contract as excavation. Computed as such, there were 259 cubic yards. The city paid for this at the contract rate for excavation of fifty cents per cubic yard, amounting to $129.50. The appellant, therefore, claims a balance for this item of $3,357.70. The contract must be construed with reference to the condition of the subject-matter at the time it was let. It is admitted that the contract, plans, and specifications contain no provision for redressing the bottom of either reservoir. The reason for this, as is clearly shown by the evidence, was that, at the

time the bids were called for, the bottoms of the basins were supposed to be already smooth, level, and down to grade. The evidence also shows that the reason for inserting the provision as to redressing the slopes was that the slopes of the lower reservoir, having passed through a winter after completion, were eroded, and when the contract was let in September, 1909, it was apparent that these slopes would have to be redressed before receiving the lining. The work of lining the upper reservoir was commenced by the appellant soon after the contract was let. About fourteen per cent of the bottom of this basin was completed before the work was interrupted by the winter rains, and no claim was made for redressing the bottom as to that part, nor for any redressing prior to March 1, 1910. This also tends to show that no redressing was necessary when the contract was let. The respondent claimed that, whatever redressing was done for this fourteen per cent was largely necessitated by the cutting up of the bottom by the appellant's teams being driven over it in rainy weather, and this seems to have been reluctantly conceded by the appellant. There was evidence that, when the work was resumed in the spring, the slopes had been more or less eroded; that the bottom had soft spots produced by water standing upon it; that rains and freezing had heaved the surface; and that the bottom had been to some extent disturbed by the progress of the work during rainy weather. We think that, on the evidence, the court would have been justified in finding that the leveling of the bottom was rendered necessary mainly by these causes. The contract, apparently in anticipation of such contingencies, provided:

"The contractor is to sustain, without claim against the city, all losses or damages to the work to be done under these specifications, arising from the action of the elements, or from any unforeseen obstruction or incumbrances on the line of work, which may be encountered in the prosecution of the same."

It is manifest that the appellant was not entitled to have work so necessitated treated as extra work under the contract. Much testimony of contractors and engineers was admitted on both sides as to whether the leveling of the bottom under a contract such as this should be considered as *excavation* or as *redressing*. This evidence was in direct conflict and furnishes little aid, but the provision in the contract itself under the head of "excavation," that—"The contractor shall make such excavation as may be necessary to bring the surface on which the concrete lining is to be placed to a true form and grade to receive the lining"; and the further implication that this shall be paid for at the price bid for excavating, leave little question that the removal of earth from the bottom must be classed and paid for as excavation. This would obviously also apply to the slopes, but for the specific provision and separate bid for redressing the slopes. The appellant contends that, because the estimates for excavation in the specifications were not much more than the actual excavation for ribs, talus, spillways, and sidewalks, therefore any other removal of earth should not be included in the provision for excavation. In view of the provision in the contract as to quantities, which we have quoted, and another immediately preceding the estimates, which contains the statement that it was agreed and understood "that the quantities are approximate only and for the purpose of comparing the bids on a uniform basis," this coincidence cannot be permitted to change what we think is otherwise a correct construction of the contract. We conclude, therefore, that if this leveling was required when the contract was let, it properly falls within the term "excavation," and should have been, and was, paid for as such. If it was necessitated by the action of the elements and the work of the appellant after the contract was let, then it was a risk assumed by the contractor for which no pay could be demanded. In either event, the appellant cannot complain. It was not extra work for which it was entitled to extra pay.

(2) The second item for which recovery was sought was for redressing the slopes of the upper reservoir to the extent of 12,229 square yards, at the contract rate of one dollar per square yard, amounting to $12,229.  The evidence, as we have seen, shows that, at the time the contract was let, the slopes of this upper basin were in condition to receive the lining with little or no redressing.  By the spring of 1910, when work was resumed, they had become considerably eroded.  The contract provided that no concrete should be laid in freezing weather, or on a soft or muddy foundation, or in rainy weather, unless properly protected by the contractor.  When the work was resumed in March, the question arose as to whether it would be most expeditious to redress the slopes, or fill the gullies with a concrete mixture and leave the banks alone.  There was evidence tending to show that any disturbance of the surface created more washing, and a soft, wet surface upon which concrete could not be safely laid.  A supplemental agreement was finally made, adopting the latter plan, as evidenced by letters in the record.  The appellant, being desirous of proceeding with the work without delay, made a written offer to the city engineer as follows:

"We will put this filling in, free of cost to the city, and assume responsibility for future washing out, on the basis of the following concessions to be made us: that all the base shall be put in on the slopes and bottom in the proportion of 1-3-6, assuming a barrel of cement to be 3.5 cubic feet, as stated in the specifications, and the concrete to be proportionate in the ratio of 1.03 barrels of cement, 10.8 cubic feet of sand, and 21.6 cubic feet of gravel, the top to be in the proportion of 1-1½ or 11.9 cubic feet of cement to 17.8 cubic feet of sand.  The above is also made with the understanding that the grade on the bottom and on the sides will be lowered an inch or more in order that the flat surfaces will not require more than six inches of base.  This will, of course, save the city the expense of paying us for back filling, and place the concrete on solid instead of tamped earth.  The ribs are to be put in exactly the same size as before, with the

proportion of 1-3-6, as above, you to pay us for excavation and yardage of these. Should you wish to change the size of the ribs, kindly let us know at once."

The city engineer answered, accepting this offer with the understanding "that the quantities for which payment is to be made are to be computed as though the lining were seven inches thick over the surface of the reservoir, and that no account is to be taken of the concrete which is necessarily used to fill the gullies eroded in the sides of the reservoir basin; that the ribs are to be measured as though they were 4" x 8" in cross-section; that the earth which has washed from the slopes is to be removed by you without cost to the city." This supplemental agreement cheapened both the base and the mortar surface, by requiring less cement, as the evidence shows, to the extent of 2-10 of a barrel to each cubic yard of concrete. The very purpose of the agreement was to avoid the necessity and consequent delay to the appellant of redressing the slopes on the one hand, and the expense to the city of redressing the slopes on the other. The contract, it will be remembered, provided for redressing only when necessary in the opinion of the city engineer.

While there was much testimony that the slopes were redressed to the extent claimed, there was no sufficient proof that this was ordered by the city engineer. Both the president of the appellant and its foreman testified that they were required (the inference being by some one representing the city) to remove the surface of the slopes with pick and shovel from an inch to in some places four or five inches. On the other hand, the city engineer testified that, under the supplemental agreement, "they were to proceed with the work and to fill the gullies, which had eroded, with concrete at a given price, and no instructions were given and no requirements made that they should dress the slopes." The engineer in direct charge of the work for the city, and who reported directly to the city engineer, also testified that neither he nor any of his assistants that he knew of ever gave any order

to redress the slopes. The city engineer, however, learned that the redressing was being done, since, on April 25, 1910, the president of the appellant company wrote to him that the appellant would run behind to the extent of $6,000 or $7,000 for resurfacing the slopes and bottom, and stated:

"This can in no way be interpreted to be covered by our figure for excavation, and you would doubtless feel injured if we tried to apply our figure of one dollar per square yard which was intended to cover the resurfacing of the slopes in the lower reservoir. We would therefore ask that we be allowed fifteen cents per square yard for this resurfacing from the time we began work this spring, which will amount to about 9,000 yards on the slopes and about 20,000 yards on the bottom."

The city engineer, as he testified, after looking over the work, answered this letter on May 12, as follows:

"As to the slopes, the work you are doing is certainly covered by the agreement entered into under the date of March 22, in my letter accepting your proposition of March 21; as you know, you were granted a concession in the amount of cement used, which amounts to about 2-10 of a barrel to each cubic yard of concrete, and this concession is being applied to the bottom as well as the slopes of the reservoir."

In view of these facts, it is evident that both parties recognized that they were then proceeding under the supplemental agreement which had superseded the original contract as to this resurfacing. In fact, the appellant seems to concede that the contract price of one dollar per square yard was originally intended to apply only to the slopes of the lower reservoir. This is further supported by the testimony of the appellant's president that the bid was unbalanced, in that it was higher for the redressing and lower for the concrete in the lower reservoir. The contractor, having received the benefit of the supplemental agreement by a cheapening of the mixture throughout, cannot dispute this. Having received the consideration moving to it in the cheapening of the mixture, the defendant cannot question the right of the city

to the consideration moving to it, viz., the saving of the cost
of redressing the slopes.  Under the supplemental agreement
it received pay at the contract price for a lining of seven
inches thick, no matter how much thicker it actually might .
be in places on account of erosion of the slopes, and mani-
festly some material was saved by the partial redressing of
the slopes.  On the conflicting evidence, we cannot say that
the redressing was ordered by the city engineer.  We are
unable to find that the court erred in refusing to allow this
item.

(3) The third item was for 585.5 cubic yards of concrete
which it is claimed was used upon the sides and bottom of
the upper reservoir in excess of the seven inches agreed upon
in the contract.  This, at the contract rate of $9.18 per
cubic yard, amounts to $5,374.89.  It is clear that, under
the supplemental agreement, there can be no recovery for
excess concrete used on the slopes.  The only specific esti-
mate which we have been able to find relating to the bottom
of the reservoir alone is one made by the engineer of the
appellant from condemned slabs removed from the bottom.
He placed the amount of excess concrete used in the bottom
at 504.5 cubic yards.  Since the respondent offered no evi-
dence in contradiction of this, we will assume that it is ap-
proximately correct.  The respondent claims that, under the
supplemental agreement, the appellant was not entitled to
pay for excess concrete, whether placed on the slopes or on
the bottom.  A reading of the correspondence which we have
quoted constituting this agreement is a sufficient answer to
this contention.  That agreement was manifestly intended to
apply only to the excess concrete used on the slopes.  The
appellant is entitled to recover for 504.5 cubic yards of con-
crete at the contract price, amounting to $4,631.31.

(4) The appellant sought also to recover for 830.7 cubic
yards of concrete placed in the bottom of the lower reservoir,
which it is claimed was in excess of 7.5 inches thickness agreed

upon in a supplemental agreement. This, at the contract price of $9.08 per cubic yard, amounts to $7,542.75. To avoid controversies similar to those which developed as to redressing the slopes and bottom of the upper reservoir, several conferences were had and letters passed between the officers of the appellant and the city engineer before work was commenced upon the lower reservoir. The point of friction was resurfacing the bottom, the appellant desiring to avoid doing this at the contract price of fifty cents per cubic yard for excavation. These negotiations culminated in a written proposal from the appellant, dated June 7, 1910, the portions of which, material to the matter here under consideration, were quoted in the answer of the city engineer dated June 14, with his acceptance, modification, or rejection, as follows:

" '5. In lieu of your changing the base concrete to 1-3-6 and the surface to 1 to 1½, we agree to make the base of an average thickness of 6½ inches, as stated above for the slopes, and the same average of thickness on the bottom.' This is accepted. '6. The bottom is to be prepared for the concrete by simply rolling with a steam roller, to within twenty feet of the foot of the slopes, from which point to the foot of the slopes the surface is to be finished in excavating the talus.' '7. We are to be allowed the cost of doing the rolling, you to stand the cost of loading and unloading the roller on the cars, and we to pay for transportation of the same.' These paragraphs are accepted. '8. We presume you will desire to go over the entire bottom with a street-surfacing machine to remove the clover and weeds before the rolling is done, which will not be of any considerable expense, but will, we assume, be included within the cost of rolling.' It is my opinion you should remove this clover at your own expense, as it has all grown since the contract was awarded you, and would not have required removing if you had laid the lining sooner. '9. A new grade is to be agreed upon by your Mr. Alexander and our Mr. Rollins, so that the thickness of the base will average 6½ inches with an allowed variation of from 5 inches to 8 inches.' This proposition is accepted, with the understanding that the base of each slab is to

average 6½ inches, with a maximum thickness of 8 inches, and a minimum thickness of 5 inches."

Item 6 as to steam rolling was afterward waived by the respondent. It is thus apparent that the changes contemplated were change of grade to avoid redressing the bottom, change of thickness of lining to compensate for unevenness of the bottom, and change of proportions of the concrete aggregate. The evidence shows that there was a delay in Rollins and Alexander, engineers for the contractor and city respectively, getting together to agree upon the new grade. Rollins, however, made an estimate that a raise of grade of 0.15 of a foot would give an average thickness of base of from 6⅜ to 6⅝ inches, which would make the average thickness of lining 7⅜ to 7⅝ inches. He estimated that the added thickness of base over 6½ inches average would not require over 100 cubic yards of additional concrete, and Alexander told him the city would pay for that amount. Accordingly, on June 20, the president of the appellant company wrote the city engineer, offering to proceed on that basis. This. letter was not answered at once, and the president of the appellant, on June 24, wrote another letter, stating that the appellant would clean the grass and weeds from the bottom, take off high points amounting to ten or twelve per cent at the "newly established grade so that no part of the base will be less than five inches thick, and make no extra charge for any excess concrete in the bottom, on the basis that we are to make the base 6¼ inches instead of 6½ inches on the slopes. We have instructed our Mr. Davis to go ahead at once on this basis, as we can think of absolutely nothing else but what is fully agreed upon." On June 28 the city engineer in answer to these letters, after quoting the last one, continued:

"I understand this to mean that the grade of the finished surface of the bottom of the reservoir is to be raised 0.15 feet above the original levels shown on our plan for the entire area; that the minimum thickness of the base of the slabs

in the bottom of the basin is to be 5 inches and the minimum finished thickness 6 inches, including the mortar surface; that you will do such grading and surfacing as may be necessary to secure such minimum thickness; that you will make no charge for grading or surfacing the bottom of the basin or for removing clover or weeds; that the thickness of the base of the slab on the slopes is to be 6¼ inches or 7¼ inches, including the mortar surface, and that the concreting in the lining of the reservoir on both sides and bottom is to be computed as though it were 7 inches thick, including the mortar surface, and paid for at the rate of $9.08 per cubic yard based on this measurement. Should it prove that raising the grade of the bottom 0.15 feet and grading off such area as may be necessary to secure such minimum thickness produces slabs having an average thickness of more than 7½ inches, including the mortar surface, that you are to make no claim for extra yardage in concrete. This letter is intended to fulfill and confirm the terms of your letter of June 7th, referred to as paragraph 9 in my letter of June 14th, in which you say 'a new grade is to be agreed upon by your Mr. Alexander and our Mr. Rollins, so that the thickness of the base will average 6½ inches, with an allowed variation of from 5 inches to 8 inches'; and to explain and render definite this agreement as to the position of the grade and thickness of the concrete lining. With this understanding, your proposal is accepted."

To this the appellant answered:

"Replying to yours of the 28th, you are correct in all the statements contained therein, and also in your understanding that no charge will be made for grading or surfacing the bottom, or for removing the clover and weeds, except the compensation of ¼ inch reduction in the thickness of the concrete base on the slopes, making it 6¼ inches instead of 6½ inches."

It transpired that the raise of grade of the bottom of the reservoir 0.15 feet increased the amount of concrete by making the thickness of the lining greater than the appellant's engineer had estimated. It is for this excess concrete that the claim is made. There can be no question that there was a meeting of the minds on the grade as fixed. While there

is evidence to show that the city engineer and Alexander, prior to the acceptance of the appellant's offer to fix the grade at a raise of 0.15 feet, had checked the matter up so they were sure the city would be safe in accepting that grade, and indeed knew that the grade could be safely fixed much lower, this fact cannot override the plain offer to so fix the grade and its acceptance by the city. The parties were dealing at arm's length, and the representatives of the city were not required to do more in passing upon this offer than to see that it was safe for the city. The court cannot stand *in loco parentis* to the contractor. There can be no recovery for this item.

The judgment is reversed, with directions that the writ issue for the allowance and payment of $4,631.31, which we have found due for the third item claimed.

MOUNT, C. J., MORRIS, and FULLERTON, JJ., concur.